**BROOKLYN BOROUGH GAS CO. v. PRENDERGAST et al.**

(District Court, E. D. New York. December 13, 1926.)

No. E-1275.

**I. Gas ⚖14(1)—State statute, prescribing rate of $I per thousand feet for gas, held confiscatory (Laws N. Y. 1923, c. 899).**

Laws N. Y. 1923, c. 899, prescribing rate of $1 per thousand feet for gas of 650 British thermal units, *held* confiscatory and invalid as to particular gas company.

**2. Gas ⚖14(1)—Eight per cent. held reasonable rate of return for gas company.**

Eight per cent. *held* reasonable rate of annual return on property of gas company.

**3. Public service commissions ⚖7—Value of public utility's property for rate purposes depends on peculiar facts of each case.**

In determining value of public utility corporation's property for rate-making purposes, each case must be determined on its own peculiar facts.

**4. Public service commissions ⚖7—Book cost, in confiscation rate case, is not decisive of value.**

Book cost, in confiscation rate case, is not decisive of value, since it indicates price of acquisition of property, and not present value.

**5. Public service commissions ⚖7—Land not yet used, but reasonably acquired by public utility for future use, may be allowed as part of rate base.**

In determining value of public utility corporation's property for rate-making purposes, land not yet in use by corporation, but reasonably acquired for future use, may be allowed as part of rate base.

**6. Gas ⚖14(1)—Expense of removing and relaying pavement in laying gas mains should be considered in determining value for rate purposes.**

Expense to gas company of removing and relaying pavement in laying gas mains should be considered in determining value of mains for rate-making purposes.

**7. Public service commissions ⚖7—Cost of land, material, labor, and overheads must be considered for rate-making purposes.**

In determining value of public utility corporation's property for rate-making purposes, cost of land, material, and labor does not alone represent construction cost, but overheads also must be allowed.

**8. Public service commissions ⚖7—Going value of public utility must be considered for rate-making purposes.**

Going value of public utility must be considered for rate-making purposes, though such rate does not include good will, franchise value, nor "pioneer losses," but does include cost of obtaining and developing business.

**9. Public service commissions ⚖7—Value of public utility's property, and not reproduction cost, is ultimate basis of rates.**

Value of public utility corporation's property, and not reproduction cost, is ultimate basis of determining rates to be charged.

In Equity. Suit by the Brooklyn Borough Gas Company against William A. Prendergast and others, constituting the Public Service Commission of the State of New York, and another, to have declared unconstitutional and void an act of the Legislature of the state of New York (Laws N. Y. 1923, c. 899) fixing rate to be charged for gas. On exceptions to report of special master. Report approved and confirmed.

The opinion of Special Master Alvah W. Burlingame is as follows:

The Public Service Commission of the state of New York made two orders on the 30th day of August, 1922, both dated upon that day, fixing the rate which plaintiff, a gas company, was authorized to charge for gas furnished by it, upon a sliding scale of from $1.30 per thousand cubic feet for the first 100,000 cubic feet of gas sold per month down to $1.10 per thousand cubic feet for over 1,000,000 cubic feet sold per month, and fixing the standard of gas to be furnished by it at a monthly average of not less than 537 British thermal units per cubic foot.

Orders of Public Service Commission of August 30, 1922.

The order fixing the rate is, in part, as follows:

"Ordered that on and after the 1st day of November, 1922, and until the 31st day of October, 1923, and thereafter until the commission shall otherwise order, the just and reasonable rates to be charged by Brooklyn Borough Gas Company to all customers except the municipality of the city of New York, and the classifications of the service furnished to such customers, shall be as follows:

"First 100,000 cubic feet of gas, per meter per month, $1.30 per M cu. ft.

"Next 200,000 cubic feet of gas, per meter per month, $1.25 per M cu. ft.

"Next 300,000 cubic feet of gas, per meter per month, $1.20 per M cu. ft.

"Next 400,000 cubic feet of gas, per meter per month, $1.15 per M cu. ft.

"Over 1,000,000 cubic feet of gas, per meter per month, $1.10 per M cu. ft."

The order fixing the standard, which it did generally for all gas companies in the city of New York and suburban territory, provides, among other things:

"(d) Under conditions of complete combustion * * * the gas furnished shall have a total heating value on a monthly average (made up of the average of the daily averages) of not less than 537 British thermal units per cubic foot, and a daily average (made up of the average of the daily averages) of not less than 525 British thermal units per cubic foot on any three consecutive calendar days in any month."

Contemporaneously with its two orders, fixing a rate of $1.30 for not less than 537 B. t. u. gas as to this plaintiff, the commission filed an opinion in which it said, as to the plaintiff:

"In only three cases has this commission permitted a higher rate than was in existence at the time it took office. One was in the case of the Brooklyn Borough Gas Company, which because of an extremely burdensome gas oil contract was permitted to increase its rate to $1.50 from May to September 1, 1921. At the close of this period, we reduced the rate to be charged to $1.35, being 5 cents lower than the rate at the time the commission assumed office."

In the same opinion the commission stated that the rates fixed by it for the larger gas companies were in a graduated form, ranging from $1.15 cents down to 95 cents per M cubic feet, dependent upon the amount of gas delivered per meter per month. The orders were quasi judicial. People ex rel. Joline v. Willcox, 129 App. Div. 267, 113 N. Y. S. 861, affirmed 194 N. Y. 383, 87 N. E. 517.

On September 5, 1922, the plaintiff notified the commission in writing that the terms and conditions of the orders fixing the rates and standard were accepted by the plaintiff and would be obeyed. No attempt was made by defendants, either by proof or argument, to show that the Public Service Commission in any way erred in its orders, or that such orders were in any way unreasonable, improper, or unjust, either to the plaintiff company or to the public.

### Chapter 899 of the Laws of 1923.

During the period the said orders of the Public Service Commission were, upon their face, to be in force, and on June 2, 1923, chapter 899 of the Laws of 1923 of the state of New York became effective. This statute, which became section 67-a of the Public Service Commission Law, provides that in cities of 1,000,000 or more no gas company shall charge or receive a sum per thousand cubic feet of gas in excess of $1, nor furnish gas of a standard less than 650 British thermal units. The text is as follows:

"Sec. 67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

### Rate History of Plaintiff prior to 1923 Statute.

The first rate which plaintiff was authorized to charge was $1.25 per thousand cubic feet. The company was incorporated in 1898 and the rate quoted was the maximum fixed for plaintiff's territory by chapter 566, section 70, of the Laws of 1890. For gas furnished to the city of New York gas companies were, by chapter 736 of the Laws of 1905, authorized to charge 75 cents per thousand cubic feet.

Chapter 125 of the Laws of 1906 fixed a rate of 80 cents for the Manhattan and the Bronx, but excepted plaintiff's territory from that rate, allowing therein a rate of $1.25 for

1906, $1.20 for 1907, $1.15 for 1908, $1.10 for 1909, $1.05 for 1910, and $1 thereafter. In 1913 the Public Service Commission fixed a 95-cent rate for plaintiff.

In 1916, by chapter 604 of the Laws of that year, the Legislature fixed the rate at 80 cents. In an action attacking the constitutionality of that statute judgment was entered in 1918, that the 1913 order of the Public Service Commission had been superseded by chapter 604 of the Laws of 1916, and that that statute, as well as chapter 125 of the Laws of 1906, were unconstitutional as to the plaintiff.

In 1922 the rate was fixed, as noted above, by the Public Service Commission upon a scale descending from $1.30, and in 1923 the statute under attack became effective. Then followed the rate and standard fixed by the statute under attack.

### Plaintiff Brings This Suit in Equity Attacking Constitutionality of the Statute.

Plaintiff commenced this action in equity on June 5, 1923, attacking the statute above quoted as being violative of the Constitution of the United States, in that it, as plaintiff alleges, deprives plaintiff of its property without due process of law, that it is discriminatory, and that it impairs the obligation of a contract.

### Injunction Pendente Lite.

An injunction pendente lite, continuing in effect, during the pendency of the action, the rates and standard fixed by the Public Service Commission, by its above-quoted orders, was, on July 2, 1923, granted to the plaintiff by the special statutory court, composed of Mayer, Circuit Judge, and Campbell and Garvin, District Judges.

\* \* \* \* \*

### Parties to This Action.

The plaintiff is a gas company affected by chapter 899 of the Laws of 1923 of the state of New York, and the defendants are the public officials of said state charged with the enforcement of the statute.

### Motions upon the Pleadings.

Before the taking of testimony the plaintiff made a motion for judgment upon the pleadings, upon the ground that the denials or lack of denials in the answers of the defendants are insufficient to raise issues. Defendants moved to dismiss the complaint, upon the ground that it does not state facts sufficient to constitute a cause of action, in that it fails to show a ground for relief in equity or in law, that it has not shown any experimentation with the rates as fixed by the Legislature, that plaintiff has not exhausted its remedy at law before seeking relief in equity, and that if, as alleged, an irrevocable contract has been entered into by the state in the order made by the Public Service Commission and plaintiff's acceptance thereof, the statute is void ab initio and never went into effect.

I reserved decision on both motions. The decision of such motions is not expressly included in the order of my appointment. It would be very undesirable indeed, in an action such as the present, affecting, as it does, a great body of the public, to render judgment upon technical ground alone, and I recommend that both motions be denied.

### Grounds of Unconstitutionality Urged.

The plaintiff contends that the statute impairs the obligation of its contract with the state, basing its claim in this behalf upon the orders of the Public Service Commission of August 30, 1922, and plaintiff's acceptance thereof, that it is confiscatory, and that it is discriminatory.

### Question of Estoppel of the State.

The regulation of rates is within the police power of the state. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 628. Such power cannot be limited or impaired by contract. B. E. S. R. Co. v. B. S. R. Co., 111 N. Y. 132, 19 N. E. 63, 2 L. R. A. 284; Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Brooklyn Union Gas Co. v. Prendergast, supra.

Having found from all the evidence that the statute is confiscatory, it is unnecessary to consider whether it is also discriminatory. As I have pointed out, the regulation of rates is within the exercise of its police power. Whether the state is estopped, by the orders of its Public Service Commission, to defend and justify, if it can, the exercise of that power as expressed in the statute under attack, is a question upon which there exists a diversity of judicial decision. See New York & Queens Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 628. I feel bound to defer, however, to the judicial authority in the Eastern district, as expressed by Judge Campbell.

### The Action is Not Prematurely Brought.

The defendant Public Service Commission urges that the complaint is defective and the proof insufficient, in that the plaintiff has

neither alleged nor proved that, since the enactment of the statute under attack, it has made an application to the commission for a reduction in standard; further, that in fact no such application was made. The argument is based upon subdivision 3 of section 66 of the Public Service Commission Law (Consol. Laws, c. 48), that the commission shall have the power to fix standard, notwithstanding that other standards may have been fixed by general or special statutes.

It has been held that the statute has but a single purpose, and that the rate and standard specified therein are inseparable. See cases infra. I see no ground, therefore, for holding that a resort to the Public Service Commission to alter the standard fixed by the statute is a condition precedent to the maintenance of an action challenging the constitutionality of the statute of 1923.

### The Rate and Standard are Inseparable.

The local courts in the Southern and Eastern Districts have uniformly held that the rate and standard fixed by the statute here in question are inseparable. N. Y. & Queens Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351; Bronx Gas & E. Co. v. Prendergast (D. C.) 1 F.(2d) 377; Consolidated Gas Co. v. Prendergast (D. C.) 6 F.(2d) 243; Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 628; New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F.(2d) 167.

### Plaintiff's Prior Rate Suit.

Plaintiff in 1916 instituted suit to enjoin an eighty cent statutory rate as confiscatory. Hon. Charles E. Hughes was appointed referee to hear and determine. He filed a report on July 24, 1918, finding that the statute was confiscatory. In that action, on the 24th day of July, 1918, Referee Hughes filed an opinion, wherein he considered the valuations that had been made of plaintiff's property prior to that time, as well as fixing value as of that date. It is reported in P. U. R. 1918F, 335, 17 State Dept. Rep. 81.

Before examining the valuation reached by him, it is important to compare the status of the business of the plaintiff then with what it is now. Judge Hughes says of the plaintiff's business, as of the time when it was under his review:

"The conditions of operation are peculiar, because of the fact that the winter population in the territory served by the plaintiff is much less than that of the summer, and because of the enhanced expense of distribution through a district which, taken as a whole, is still but sparsely settled. With the development of Coney Island, plaintiff's business has rapidly grown. The number of its meters in use has doubled since 1910. In that year its gas sales amounted to 213,817,000 cubic feet, in 1916 they amounted to 419,622,400 cubic feet, and in 1917 to 462,964,400 cubic feet.

Between this prior suit and the present one the business of the plaintiff has again been doubled. In 1922 it sold 922,621,400 cubic feet; in 1923, 1,080,363,400 cubic feet; in 1924, 1,173,588,700 cubic feet; and for the 12 months ending August 31, 1925, 1,278,972,700 cubic feet. Judge Hughes refers to the valuations that had been made prior to the suit in which he was sitting as follows:

"Three appraisals have been made by the Public Service Commission for the First District. In October, 1910, the commission entertained a complaint of consumers that the price of gas should be reduced and in the course of informal proceedings the corporate history and financial operations of the company were examined. The commission found that the 'minimum present value'—that is, for the year 1911—was $1,135,000. It was concluded that a reduction of the rate below the then maximum rate of $1.00 was not warranted. 2 P. S. C. Rep. 1st Dist. 620, 639.

"In March, 1913, there was a further proceeding before the commission. There was a thorough investigation by its engineers and accountants, with full opportunity to the company and its consumers to be heard. The examination was facilitated by the company, which announced that it would accept whatever ruling the commission might make for at least one year from its date. The commission found that conditions had changed since December 31, 1910, and that the case could not be properly decided without a finding as to the fair value upon which a return could be computed. Accordingly an appraisal of the property was made, with the following result as of December 31, 1912 (4 P. S. C. Rep. 1st Dist. 328, 345):

| | |
|---|---:|
| Reproduction cost | $1,144,043 |
| Depreciation | 189,159 |
| | $ 954,884 |
| Land—present value | 107,500 |
| Present value of physical property | $1,062,384 |
| Preliminary and development | 180,000 |
| Working capital | 60,000 |
| Total | $1,302,384 |

\*        \*        \*        \*        \*

"The commission found that the fair value of the property upon which the company is entitled to a fair return is $1,320,000 for 1913, and $1,400,000 for 1914."

Judge Hughes then notes that it was upon this basis that the 95-cent rate order of July 8, 1913, was made, and that, while the company accepted the rate, it notified the commission that it did not accept several items of the valuation found by the commission as "being too small." Judge Hughes proceeds:

"About five months after the order above mentioned, the plaintiff made an application for the approval of the Public Service Commission of the issuance of additional shares of capital stock to the amount of $125,000 in par value. The application was granted in December, 1913, subject to the requirement that none of the proceeds of the stock should be expended, save with the approval of the commission, on a showing that the expenditure represented a real increase in fixed capital as defined in the accounting rules of the commission. Upon the application for the withdrawal of the proceeds of sale, the commission granted its consent, on March 3, 1914, upon condition that the company should adjust its fixed capital account in accordance with an attached schedule entitled 'Schedule of Estimated Reproduction Cost and Accrued Depreciation January 1, 1914.' This schedule was as follows:

|  | Estimated Reproduction Cost. | Accrued Depreciation. |
|---|---|---|
| Organization | $ 20,000 00 | |
| Other intangible capital | 60,000 00 | |
| Land devoted to gas operations | 113,705 79 | |
| General structures | 9,667 54 | 2,741 89 |
| General equipment | 8,455 64 | 250 00 |
| Furnaces, boilers, and accessories | 23,926 71 | 5,918 48 |
| Steam engines | 1,286 00 | 85 00 |
| Water gas sets and accessories | 56,117 35 | 10,250 53 |
| Works and station structures | 76,894 80 | 11,059 32 |
| Holders | 213,160 29 | 14,080 52 |
| Purification apparatus | 31,183 80 | 3,947 45 |
| Accessory equipment at works | 71,326 16 | 10,460 72 |
| Trunk lines and mains | 537,097 27 | 88,259 28 |
| Gas services | 118,117 71 | 36,405 16 |
| Gas meters | 81,814 25 | 21,550 82 |
| Gas meter installation | 26,548 49 | 6,084 00 |
| Municipal street lighting fixtures | 5,369 00 | 1,079 00 |
| Gas engines and appliances | 2,540 00 | 2,225 00 |
| Gas tools and implements | 1,598 48 | 370 88 |
| Gas laboratory equipment | 1,007 60 | 297 08 |
| Law expenditures during construction | 15,000 00 | |
| Taxes during construction | 5,000 00 | |
| Interest during construction | 65,000 00 | |
| Miscellaneous construction expenditures | 15,000 00 | |
| Total fixed capital | $1,559,816 88 | $215,065 13 |

"The net fixed capital thus shown, after deducting the amount stated as accrued depreciation, was $1,344,751.75."

The valuation did not wholly meet the plaintiff's conception of the value of its property. Judge Hughes continues:

"In the resolution of its board of directors, adopted March 24, 1914, it was stated that the company did not admit the right of the commission to impose the conditions above mentioned, and that the company's action should not be construed 'as an acquiescence in the request of the commission as a matter of right,' but 'as a matter of policy' and in the interest of the company the recommendations of the commission were accepted and the company rewrote its books accordingly."

The books as thus rewritten were maintained on the basis thus established down to and including the 31st day of December, 1917. Judge Hughes' opinion continues:

"Starting with the commission's appraisal of the plaintiff's property as of January 1, 1914, the amount of fixed capital, as shown by the plaintiff's books at the end of each year, is as follows:

|  | Total Fixed Capital— Gross Investment. | Accrued Amortization of Capital. | Total Fixed Capital—Net Investment. |
|---|---|---|---|
| Jan. 1, 1914 | $1,559,816 88 | $215,065 13 | $1,344,751 75 |
| Dec. 31, 1914 | 1,713,998 88 | 241,549 75 | 1,472,449 13 |
| Dec. 31, 1915 | 1,769,740 75 | 262,893 49 | 1,500,847 26 |
| Dec. 31, 1916 | 1,835,650 26 | 304,794 13 | 1,530,856 13 |
| Dec. 31, 1917 | 1,907,871 70 | 336,943 16 | 1,570,928 54 |

"The amounts thus set forth as 'accrued amortization of capital' may be said, as the plaintiff states, to represent the plaintiff's depreciation fund."

As to the case before him Judge Hughes said:

"The plaintiff's contentions as to the value of its property are advanced upon two distinct bases: (1) Upon the testimony it presents as to cost of reproduction; and (2) upon the above mentioned fixed capital, in accordance with the commission's appraisal with certain additions."

Upon the first basis (reproduction) the plaintiff claimed a valuation of $2,939,634. As to the second basis Judge Hughes quotes from the plaintiff's brief submitted in that case:

"On December 31, 1917, the total fixed capital or gross investment, as shown by the books of the company, was $1,907,871.70. * * * Of this amount, however, the sum of $336,943.16 was accrued amortization of capital. This amount may be said to represent the plaintiff's depreciation fund. It is invested (as it ought to be) in the plant and business of the plaintiff. Conceding for the sake of the argument that the plaintiff should not be allowed to include this fund in the amount on which it is entitled to earn a fair return, we deduct this fund from the whole investment, leaving $1,570,928.54 as the book account. To this must be added the net floating capital, which indicates the working cap-

ital, $107,460.15,  * * *  making the total $1,678,388.69. It is entitled to earn a fair return on this last amount without question, because it has set aside, and is maintaining a fund sufficient at all times to cover depreciation. The plaintiff claims that this amount should be added for going concern value at least the sum of $422,214.46, as shown in Exhibit 19, and computed by adding the totals of the last two columns. This would make the total value for rate-making purposes at least $2,077,744.69."

The Great War was in progress at the time at which Judges Hughes wrote. He gave thorough consideration to both the bases upon which the case was submitted to him. As to the plaintiff's case on reproduction he said:

"While it is important to consider the cost of reproduction in determining the fair value of a plant for rate-making purposes, it cannot be said that there is a constitutional right to have the rates of a public service corporation based upon the estimated cost of reproduction of its property at a particular time regardless of the circumstances.

"To base rates upon a plant valuation simply representing a hypothetical cost of reproduction at a time of abnormally high prices due to exceptional conditions would be manifestly unfair to the public, and likewise to base rates upon an estimated cost of reproduction far lower than the actual bona fide and prudent investment because of abnormally low prices, would be unfair to the company.

"This question of taking the hypothetical reproduction cost under abnormal conditions as a rate base should, of course, not be confused with the necessity of recognizing actual costs of operation, even though abnormal."

The time in and of which Judge Hughes was writing was so abnormal that, as he says, the plaintiff's witness "properly shrank from predicating the validity of rates on a hypothetical cost of reproduction on December 31, 1916," and it is also to be observed that he did not take the cost of reproduction as of any particular time. His endeavor was to get at a basis for rate making by seeking a fair reproduction value based on a period of five years, and thus to avoid what he regarded as an "abnormal" reproduction cost.

Obviously, because of the reason stated, Judge Hughes rejected the first base asserted by the plaintiff, and in adopting the second basis as the foundation of his decision said:

"If, however, we are not to take the actual cost of reproduction at the present time, or within a year or so, because it would be an abnormal cost, and we are to seek some fairer

basis of estimating the value of plaintiff's property for the purpose of determining the validity of rates, it would be difficult to find any basis more just than the appraisal carefully made by public authority and based on reproduction cost before the outbreak of the European war, with proper consideration of the actual investments since that time."

The city of New York was a defendant in that action, and presented testimony showing what it called "the value of the plaintiff's property according to investment outlay." It was, said Judge Hughes, "in substance, a computation of the cost of production of the plant at the time it was actually produced. It was based upon his (the witness') examination of the plaintiff's books and upon his information with respect to the cost of other plants and his general experience. His process was to endeavor to set down the original cost of each item as of the time that when it was purchased or constructed and then to deduct estimated depreciation of various parts according to age in 1916. He purported to use actual prices paid for materials and equipment by the plaintiff as the basis for computation so far as these were available and, where records of the plaintiff were not available to determine cost, the prices actually paid by other companies for like material or construction were taken as the basis of prices. Thus the witness' testimony is an opinion as to original cost calculated by means of various unit prices derived from the plaintiff's records, or, when these are absent, from other sources and applied to portions of the plant deemed to have been constructed at particular times."

As to which the opinion continued: "I do not think it necessary to review the criticisms which have been submitted in argument with respect either to method, assumed unit prices, or quantities. Nor is it necessary to discuss the question as to the weight to be ascribed in a proceeding of this character to such a hypothetical estimate of original cost. It is sufficient to say that there is manifestly no justification for accepting this estimate of original cost in place of the value as determined by public authority constituted for that purpose. With respect to the value of the plant as it stood in 1913, the accuracy of the commission's appraisal is not impugned, and there is no reason for discarding it and following the witness in his endeavor to estimate the cost of production of the plant in the earlier years. And as to the actual cost of the additions that have been made since the commission's appraisal, there is no lack of certainty and the witness' estimate furnishes no aid whatever so far as these are concerned.

As to depreciation, as presented in that case, Judge Hughes held that there was no controversy "as to the propriety of the deduction for accrued depreciation. The allegation of plaintiff's complaint proceed upon the view that such deduction should be made." Judge Hughes further held that the plaintiff had not sustained by proof its claim to an additional amount of going value; that rate case expense should be included in operating expenses, but amortized over a short period; and that the plaintiff did not submit proper proof as to the value of the Mermaid avenue property. The opinion concludes: ·

"I therefore conclude that the fair value of the company's plant, for the purpose of determining whether the rate is confiscatory, is $1,670,492.54, as follows:

| | | |
|---|---:|---:|
| Total fixed capital as of December 31, 1917............. | | $1,907,871 70 |
| Less— | | |
| Accrued amortization...... | $336,943 16 | |
| Mermaid avenue property | 9,084 00 | 346,027 16 |
| | | $1,561,844 54 |
| Working capital ......................... | | 100,000 00 |
| Unamortized rate expense.............. | | 8,648 00 |
| Total fair value.................... | | $1,670,492 54" |

The judgment in that action was duly received in evidence herein. Of course the finding of the value of plaintiff's property as of the date of·the judgment entered upon Judge Hughes' report is a definite and binding judicial determination of value as of that date. But many years have elapsed since then; the abnormal conditions under which that learned referee declined to give full consideration to reproduction cost no longer prevail, and, so far as there is a comparison between the action of the Public Service Commission then and now, it is to be noted that the commission, less than a year prior to the enactment of the $1 statute here under attack, fixed a $1.30 rate for this company, to continue in effect for at least a year. It is not contended by either of the defendants that that rate was an unfair or an unjust one.

After Judge Hughes' report, the plaintiff applied to the Public Service Commission to fix a rate, which it did, at $1.40 per thousand cubic feet, on and after August 1, 1920. This rate was challenged by a consumer, who brought an action in the state Supreme Court. The Special Term granted a preliminary injunction against the commission's rate and fixed a rate of $1.15 per thousand cubic feet. This action was not approved by the Court of Appeals; Judge Crane, writing for that court in Morrell v. Brooklyn Borough Gas Company, 231 N. Y. 398, 132 N. E. 129, saying:

· "We find nothing in the laws or in authorities to justify such action. The Public Serv-ice Commissions Law covers the whole question. The company, by section 66, may file its own schedule of rates and change of rates. The Public Service Commission on complaint or of its own motion may modify the charges. Here on application of this company, the commission fixed the rate at $1.40. It is only where a rate has been fixed by statute that the commission cannot increase it. The only law was that of 1916 which had been declared null and void, so that there was not this limitation upon the commission.

### The Court is Not to Fix a Rate.

"Our concern," says McReynolds, J., "in Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, "is with confiscation. Rate making is no function of the courts; their duty is to inquire concerning results and uphold the guaranties which inhibit the taking of private property for public use without just compensation under any guise."

### The History, Territory, and Organization of the Plaintiff.

In 1877 the former town of Gravesend granted to one John Lockwood certain franchises to lay, construct, maintain, and operate mains, pipes, and conductors for the furnishing of gas in the town, which franchises, together with other property, were by mesne assignments and deeds acquired by the Coney Island Fuel Gas & Light Company (incorporated in 1881). The plaintiff was incorporated under the Transportation Corporations Law of the state of New York (Laws N. Y. 1890, c. 566) on February 21, 1898, and by deed from the Coney Island Fuel Gas & Light Company, dated March 5, 1898, acquired the property franchises and rights of that company.

The plaintiff is engaged in the business of manufacturing and selling gas to public and private consumers. The territory in which it operates is the Thirty-First Ward of the borough of Brooklyn, which was formerly substantially the old town of Gravesend. Included in that territory is Coney Island. Compared with other areas within the metropolis, a large part of the plaintiff's territory is a sparsely settled section, where in a number of sections houses are far apart. It lies right at the sea coast, and many of its mains are laid in sand, and some of them through salt water. There are comparatively but few manufacturing or large industrial establishments throughout the district, so that the number of the company's consumers for large quantities of gas for industrial purposes is very limited.

As metropolitan gas companies go, this is to be rated as relatively a small company in an outlying district. Differentials in favor of such companies have been in vogue for some time past. The Eighty-Cent Gas Law of 1906 (Laws 1906, c. 125) expressly authorized a $1.25 rate in plaintiff's territory as against 80 cents throughout the major parts of the city, and as recently as the order of the Public Service Commission of August 30, 1922, the plaintiff was authorized to charge $1.30 as against the rate of $1.15 for companies in the more densely populated sections. The company's outstanding capitalization as of June 1, 1923, was as follows:

| | |
|---|---:|
| Bonds | $ 916,000 00 |
| 8 per cent. preferred stock.. | 292,000 00 |
| Common stock (40,000 shares of no par value) | 1,000,000 00 |
| Total | $2,208,000 00 |

This amount is, of course, exclusive of other obligations or liabilities, which are offset by investments in the plaintiff's property.

### Rate of Return.

The plaintiff urges that it is entitled to earn a 10 per cent. return upon the present value of its property; defendants contend that a 6 per cent. return is sufficient.

The plaintiff called James E. Allison, consulting engineer for the Laclede Gas Company of St. Louis, who, after duly qualifying, testified that the rate of return should be such as to yield earnings sufficient to induce a new set of investors to re-create the property of the plaintiff and render the service performed by it. Miss Mary E. Dillon, vice president of plaintiff, testified that recently the plaintiff had to pay as high as 12 per cent. for capital funds.

The defendants called no witnesses upon this feature of the case, but presented a computation tending to show that the earnings of the common stockholders would be very substantial under an 8 per cent. return; but that, even if true, is not, so far as I have been able to ascertain, any reason for prescribing a different rate, if, all things duly considered, that return is a fair and just one.

The plaintiff is under obligation, by virtue of express command of statute, as well as of general law, to provide such service, instrumentalities, and facilities as shall be safe and adequate, and in all respects just and reasonable, and to make reasonable improvements and extensions of its works, mains, apparatus, and property. It serves a territory of which large areas have been and are being reclaimed and developed, and the extension of service to which must require large outlays of additional capital. The civic, social, and economic benefits of the making of extensions into the developing sections of the borough of Brooklyn, and of the furnishing of adequate and efficient service, are obvious. To discharge these duties, the plaintiff must be able to attract capital upon a basis that will assure to the investors a just reward for the use of their capital.

In Bluefield Waterworks & Improvement Company v. Public Service Commission of West Virginia, 262 U. S. 679, 692, 693, 43 S. Ct. 675, 679 [67 L. Ed. 1176] the United States Supreme Court, in discussing the rate of return which will constitute just compensation, said:

"The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

The great weight of authority in this and in the Southern district favors an 8 per cent. return. Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192; N. Y. & Queens Gas Co. v. Prendergast (D. C.) 1 F.(2d) 351; Bronx Gas & Electric Co. v. Prendergast (D. C.) 1 F.(2d) 377; Consolidated Gas Co. v. Prendergast (D. C.) 6 F.(2d) 243; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F. (2d) 628. And that rate is, I feel, controlling upon this court in this case.

### Operating Expenses.

The plaintiff presented the following summary of its operating expenses for the year 1923, as drawn from its books of account:

| | Amount. | Costs per M C F Sold —Cents. |
|---|---:|---:|
| Cost of production | $ 544,595.96 | 50.4086 |
| Cost of distribution and other general expenses | 383,578.54 | 35.5046 |
| Retirement expense | 32,410.91 | 3.0000 |
| Taxes exclusive of federal income tax, but including interest on unpaid taxes | 56,703.91 | 5.2486 |
| Uncollectible bills | 5,857.39 | .5421 |
| Total operating cost | $1,023,146.71 | 94.7039 |
| Less miscellaneous operating revenue | 37,183.38 | 3.4417 |
| Net cost (exclusive of federal income tax and aside from any return on the property.. | $ 985,963.33 | 91.2622 |
| Federal income tax | 34,076.06 | 3.1541 |
| Actual net cost of gas of quality actually supplied (inclusive of federal income tax, but exclusive of any return on the property) | $1,020,039.39 | 94.4163 |

Gas made in 1923..1,185,945,000 cubic feet
Gas sold in 1923....1,080,363,400 cubic feet

The cost per thousand cubic feet is arrived at by dividing the entire operating expense, $1,020,039.39, by the number of cubic feet sold during the year, 1,080,363,400, resulting in 94.4163 cents per thousand cubic feet.

The average thermal content of the gas supplied by the plaintiff during the year was 548.8 British thermal units, considerably less than the standard 650 B. t. u. fixed by the statute. If the plaintiff had attempted to supply gas of the latter standard it could have done so only at an additional cost of 5.05 cents per thousand cubic feet of gas made, or 5.54 cents per thousand cubic feet of gas sold. This would have made the full operating cost for 650 B. t. u. gas the sum of 99.9563 cents.

If the rate and standard fixed by the statute had been applied by the plaintiff during the year 1923 it would have received the very trifling return, over operating costs alone, of only $0.000437 per thousand cubic feet, without the allowance of any return whatever upon its property used and useful in its gas business. Operation compelled under such a rate and standard is clearly confiscatory.

Neither the defendants nor the court is charged with the management of the plaintiff; neither may, in the absence of a showing of mismanagement, inefficiency, or bad faith, substitute its business judgment for that of plaintiff's officers. After the fullest examination of the plaintiff's property, books, and method of management, and after testing the truth of plaintiff's witnesses by cross-examination, defendants presented no evidence of fraud, waste, or inefficiency in plaintiff's management. Indeed, the testimony of the witness produced by the defendants, Mr. Little, is to the contrary. He found and testified that the management of the plaintiff was above the average.

Defendants, however, attack the plaintiff's claimed operating expenses in two ways: By objecting to certain items proved by the plaintiff; and by presenting a countertabulation. Objections are made by defendants to the salaries of two of plaintiff's executive officers, not upon the ground that the amounts are excessive, but because the officers are nonresidents, not devoting their full time and attention to the affairs of the plaintiff. It is not claimed that the officers are inefficient. The entire basis of the objection is that the officers are in Philadelphia, and not in Brooklyn. Certainly the directors of the plaintiff should not be curtailed in their legal right to select the officers of plaintiff, nor should their responsibility for the acts of the officers selected by them be disturbed upon grounds as flimsy as this alone.

Other items objected to include general law expense, uncollectible bills, dues to gas associations, expenses for appraisals, and some clerical salaries, all of which amount in all to about the sum of $34,000; but defendants as to none of them have presented any evidentiary basis for striking out these actual operating outlays, incurred in good faith for company purposes.

Defendants' conception of what plaintiff's operating expenses ought to be follows:

| Operating Expenses. | Amount. | Cents per M Cu. Ft. of Gas Sold. |
|---|---|---|
| Production expense.......... | $ 608,241.36 | 47.56 |
| Distribution expense......... | 112,097.49 | 8.76 |
| Commercial expense........ | 115,836.74 | 9.06 |
| New business expense....... | 31,727.62 | 2.48 |
| General expense............. | 198,313.01 | 15.50 |
| Total .................... | $1,066,216.22 | 83.36 |
| Retirement expense......... | 38,369.17 | 3.00 |
| Total .................... | $1,104,585.39 | 86.36 |
| Taxes ...................... | 74,918.11 | 5.86 |
| Total operating revenue deductions .................... | $1,179,503.50 | 92.22 |
| Less miscellaneous revenue —operating ................ | 39,220.24 | 3.07 |
| Net cost of gas sold......... | $1,140,283.26 | 89.15 |

M Cubic feet of gas sold—1,278,972.7.

This calculation by the defendant Attorney General is not for the year 1923, but for the 12 months ending August 31, 1925. It does not purport to be based upon the cost of supply of 650 B. t. u. gas, and for that reason falls somewhat short of giving a comparable basis for testing this statute.

Defendants do not contend that the plaintiff did not actually incur every item of operating expense as claimed, nor do they suggest that the plaintiff bases its claim upon other than accurate books of account. They did not prove waste or inefficiency, and I see no reason for substituting the hypothetical judgment of the accounting witness for one of the defendants for the actual experience of the plaintiff in the operation of its business, and I am of the opinion that operating expenses should be allowed in the amount claimed and proved for the year 1923, of $1,020,039.39.

## Plaintiff is Entitled to Fair and Reasonable Return on Present Value of Its Used and Useful Property.

It is now well and definitely settled that a public utility is entitled to earn a fair and reasonable return upon the present value of its property used and useful in the public service. State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service

Commission, 262 U. S. 277, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefields Waterworks & Improvement Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968; City of Houston v. Southwestern Bell Telephone Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

### Ascertaining the Present Value.

There is not the same clarity or uniformity of expression as to how the present value is to be ascertained. No fixed formula has been prescribed by the Supreme Court. Indeed, that court has expressly ruled that it is not a matter of formula or of fixed rules. That court has never gone so far as to say that reproduction cost new is the only element to be considered. Nor, on the other hand, has it ever selected any other particular method as the one and only decisive means of calculating value. "It is to be borne in mind," says Butler, J., in Standard Oil Company v. Southern Pacific Co., 268 U. S. 146, 45 S. Ct. 465, 69 L. Ed. 890, "that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide."

It has been said that the value need not be determined by considering replacement cost only, or replacement less depreciation, but there may also be considered, if they can be ascertained, and appear to have a relevant bearing, the original cost of production, amounts expended for permanent improvements, amounts and values of stocks and bonds, present as well as original costs of production, probable earning capacity of property under rates prescribed by the statute, sums required for operating expenses, and such other relevant facts as may be available, giving each such weight as may be just and right in each case. Smyth v. Ames, 169 U. S. 546, 18 S. Ct. 418, 42 L. Ed. 819; Minnesota Rate Cases, 230 U. S. 434, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034;

State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Waterworks & Improvement Company v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Georgia Railway & Power Co. v. Georgia, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 628.

Winslow, J., in Consolidated Gas Co. v. Prendergast (D. C.) 6 F.(2d) 243, has tersely pointed out that "it is the property, and not the original cost, which the owner may not be deprived of without due process." In the present case, there is no issue as to the amount or extent of the plaintiff's property. The inventories are unchallenged.

The plaintiff presented full and detailed proof as to the cost of reproduction of its property. The defendants offered no testimony as to the value of plaintiff's property, other than the estimates of Mr. Merrifield as to the value of the mains, and of Mr. Little as to the value of mains, services, and meters, all of which estimates were based upon an assumed reproduction of plaintiff's property. Plaintiff's witnesses as to value were subjected to lengthy and rigid cross-examination.

The cases are practically unanimous that each case must be determined upon the facts peculiar to it, and, viewing the question of value primarily as a question of fact rather than of law, I have received all testimony proffered upon that question and endeavored to give to all such testimony proper consideration and weight, without yielding to any one particular theory, to the exclusion of all others, in the effort to achieve the real goal, viz. the present value of the property.

### Book Cost.

The original cost of all the plaintiff's property has not been proved in this action. The Public Service Commission required the plaintiff to rewrite its fixed capital accounts as of the 1st day of January, 1914. Original cost prior to that date was absorbed in the rewriting, which was based upon an appraisal of plaintiff's property by the commission. The plaintiff maintains, and it is not controverted by the defendants, that all entries to its fixed capital accounts since 1908 have been checked up by the Public Service Commission.

Plaintiff produced, and there were marked in evidence, its general ledgers for the years 1922, 1923, 1924, and 1925, and its general journals for the same years, and its voucher records for the same years (Plaintiff's Exhib-

its 79–82), and presented a statement, prepared from such books, showing the costs of its gas properties as shown by such books and accounts. This summarizing statement was received in evidence as Plaintiff's Exhibit 97. Defendants raised no question as to its accuracy. The balance in the fixed capital accounts of plaintiff, as of June 1, 1923, is as follows:

| | |
|---|---:|
| Land occupied by gas works............ | $ 131,977 05 |
| Land occupied by outside holder stations | 21,968 00 |
| Other land................................. | 21,136 52 |
| Organization ............................. | 29,023 01 |
| Other intangible gas capital.............. | 60,000 00 |
| General structures........................ | 42,634 94 |
| General equipment........................ | 47,785 21 |
| Works and station structures............. | 232,957 18 |
| Holders................................... | 297,565 14 |
| Furnaces, boilers, and accessories....... | 51,538 59 |
| Steam engines............................ | 1,455 53 |
| Miscellaneous power plant equipment.... | 683 82 |
| Water gas sets and accessories........... | 159,831 17 |
| Purification apparatus.................... | 83,240 91 |
| Accessory equipment at works............ | 161,450 38 |
| Trunk lines and mains.................... | 1,054,740 59 |
| Gas services.............................. | 295,247 84 |
| Gas meters............................... | 282,734 36 |
| Gas meter installation.................... | 92,301 62 |
| Gas engines and appliances.............. | 9,140 62 |
| Gas tools and implements................. | 6,694 75 |
| Gas laboratory equipment................ | 8,111 53 |
| Law expenditures during construction.. | 15,000 00 |
| Taxes during construction................ | 5,000 00 |
| Interest during construction............. | 65,000 00 |
| Miscellaneous construction expenditures | 15,000 00 |
| | $3,192,218 81 |

This amount is exclusive of working capital, going value, and other elements of value not charged to the fixed capital accounts. Book cost in a confiscation rate case is not decisive of value, and quite properly, for it indicates the price of acquisition of property, which is one thing, and not present value, which is quite another thing.

## Reproduction Cost.

The plaintiff offered detailed proof of the reproduction value of its property as of the 1st day of June, 1923. It brought into court its books of account, kept in the ordinary course of its business; it produced and had sworn the executive officers charged with its management; it presented full and detailed inventories and appraisals of the various items of its property, and called opinion witnesses of experience, ability, and of a standing recognized in this court and in the Southern district, who testified at great length, both upon direct and cross-examination, as to the value of its property. The plaintiff, in its brief, summarized its case upon valuation as of June 1, 1923, and totals its claim, as drawn from the testimony, exhibits, and its books of account, as follows:

16 F.(2d)—40

| | |
|---|---:|
| Land, as appraised by William P. Rae.. | $ 430,500 00 |
| Buildings, as appraised by Henry R. Burt ...................................... | 224,186 00 |
| Gas-manufacturing plant and holders (other than land and buildings)........ | 1,007,238 00 |
| Street mains and special material, as appraised by H. J. Dillon.............. | 2,100,761 00 |
| Services, as appraised by H. J. Dillon... | 625,920 00 |
| Meters .................................... | 408,639 00 |
| General equipment, including offices, store, stable and laboratory equipment, as shown by the books of the company | 53,906 00 |
| Tools and implements as shown by the books of the company.................. | 7,694 00 |
| Gas engines and appliances, as shown by the books of the company.............. | 8,991 00 |
| Working capital........................... | 540,000 00 |
| Going value............................... | 1,015,256 00 |
| Omissions and contingencies............. | 50,362 00 |
| Organization and development prior to construction ........................... | 325,000 00 |
| Cost of financing......................... | 340,000 00 |
| Engineering and superintendence and general contractors' expense and profit | 439,731 00 |
| Interest during construction............. | 217,153 00 |
| Taxes during construction................ | 4,918 00 |
| Administrative, legal, and miscellaneous general expense during construction.. | 95,557 00 |
| | $7,895,812 00 |

## The Attorney General's View.

The defendant Attorney General presents no figures as his estimate of the value of the plaintiff's property, except as hereinafter discussed, but asks that the statute be found to be constitutional, and that the complaint be dismissed, largely on the questions of law to which I have referred.

## The Public Service Commission's View.

Counsel for the defendant Public Service Commission, while he asks that the complaint be dismissed, maintains that, if it is necessary to find a value for the purposes of this case, such value need not exceed for land used, plant, structure, equipment, etc., mains and services, as of June 1, 1923, the sum of $2,587,713.47, and for working capital $100,000, a total of $2,687,713.47.

## Value of Property as to Which Defendants Offered No Proof.

Most of plaintiff's proof as to the claimed values stands uncontradicted upon the record; the defendants producing testimony only as to the value of mains, services, and meters, and as to the value of undistributed structural costs. They also offered testimony as to working capital and going value. The plaintiff offered no proof as to accrued depreciation, other than the cost to restore certain of its property to a condition as if new, and defendants offered no evidence whatever of depreciation or of the amount thereof.

It appeared without contradiction that the expenditure of $5,424 would restore the buildings to a condition as if new, and $24,236.41

was required for that purpose as to apparatus and equipment. Plaintiff does not concede that even these amounts should be deducted from its valuations, but it is bound by the evidence which it itself has produced. The physical items and their production cost, as to which there is no conflict upon the record, with deductions to restore to a condition as if new, are as follows:

| | | |
|---|---:|---:|
| Buildings | $ 224,186 00 | |
| Less cost to restore to a condition as if new | 5,424 00 | $ 218,762 00 |
| Gas manufacturing plant, and holders (other than land and buildings) | 1,007,238 00 | |
| Less cost to restore to a condition as if new | 24,236 41 | 983,001 59 |
| Meters | | 408,639 00 |
| General equipment, including offices, stores, stable, and laboratory equipment | | 53,906 00 |
| Tools and implements | | 7,694 00 |
| Gas engines | | 8,991 00 |
| | | $1,680,993 59 |

Mr. Little, a witness produced by the defendants, offered some testimony as to the value of the meters. He placed a value thereon of $440,000, a value higher than that claimed by the plaintiff.

### The Value of Land.

The evidence showed that the plaintiff at the time of the trial owned some seven parcels of land. They are, briefly:

(1) Plant site, on the northerly side of Coney Island creek between West Eighth street and Stillwell avenue, containing about 551,668 square feet, with a frontage of about 1,350 feet on the creek and an average depth of 650 feet; there is an additional plot on the other side of the creek, included in this parcel, with a frontage of 75 feet and a depth of 100 feet. Both parcels are connected by a bridge over the creek. Plaintiff's works are located on this site.

(2) Main office at Mermaid avenue and West Seventeenth street, with a frontage of 58.81 feet on Mermaid avenue and a depth of 100 feet. On June 1, 1923, plans had been filed for the erection of an office building for the use of the plaintiff on this site, which has since been constructed and occupied.

(3) Corner of West Eighth street and Sheepshead Bay road, purchased on November 9, 1923, when the city notified the plaintiff to stop work on its proposed building upon parcel No. 2, because of a planned widening of West Seventeenth street, which proposal was later abandoned. Plaintiff, at the time of the trial before me, was offering this par-

cel for sale, and does not seek a valuation thereof in this action.

(4) Site of old plant, Sheepshead Bay road and West Fifth street, with a frontage on Sheepshead Bay road of 127 feet and depth of 260, whereon the plaintiff plans the erection of a group of service buildings, including a fitting shop, warehouse, and garage.

(5) East side of Coney Island avenue, south of Avenue P; acquired in 1915 for the establishment of a branch office. Another section of plaintiff's territory developed more rapidly, which caused the abandonment of the plan to establish the office here.

(6) East side of Sheepshead Bay road, south of Voorhis avenue, acquired August 16, 1923, for a branch office.

(7) 1703 King's Highway, acquired September 25, 1924, for a branch office.

As noted above, the plaintiff seeks no valuation for parcel No. 3, and parcels numbered 6 and 7 were acquired after June 1, 1923, and are not shown in the valuation of plaintiff's property as of that date, although included in later valuations. The only witness examined as to the value of this realty was Mr. William P. Rae, called upon behalf of the plaintiff, who valued the property as follows: Parcel No. 1, $335,000; No. 2, $43,000; No. 4, $40,000; and No. 5, $12,500—a total of $430,500.

Defendants offered no witnesses as to the value of the land. The company's book cost of the land is $175,081, and the assessed valuation thereof, as reported by the plaintiff to the Public Service Commission for 1923, was $130,500. Neither of these figures reflect the real value as of the time of this inquiry.

The court is not vested with managerial powers, and cannot substitute its own business judgment for that of the company's officers. Consolidated Gas Co. v. Newton (D. C.) 267 F. 231, affirmed sub nom. Newton v. Consolidated Gas Co., 258 U. S. 165, 176, 42 S. Ct. 264, 66 L. Ed. 538; State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; People ex rel. D. & H. Co. v. Stevens, 197 N. Y. 1, 90 N. E. 60.

It has been held that land not yet in use, but reasonably acquired for future use, may be allowed as part of the rate base. Consolidated Gas Co. v. Newton (D. C.) 267 F. 261, 263, 267, 268; Brooklyn Borough Gas Co. v. Public Service Commission, 17 N. Y. State Dept. Rep. 81.

Parcel No. 2 was reasonably acquired for the site of a main office. That work thereon had not so far progressed that on June 1,

1923, it could be put to the actual use intended for it upon that date, was merely incidental, as the building was occupied so afterwards, and is admirably planned for the company's purposes. Parcel No. 4 is very valuable land, for which the company has and had very definite and specific use, and that the company has not yet improved it does not affect its availability for the use intended nor the necessity of that use. The company acquired site No. 5 for a branch office, and the fact that another section of plaintiff's territory developed faster than that in which this property is located was unforeseen, and is no reflection whatever upon the officers of the company. I am of the opinion that all three parcels were reasonably useful to the company upon June 1, 1923, or deemed to be in the future following that date, and that all should be allowed in the rate base.

That there was, when the company purchased this property, a lease as to parcel No. 6 that had a short term to run, in force, does not affect the wisdom of its acquisition nor the value of its use, and that tenants occupy the upper floors of parcel No. 7 is no reason for disallowing that property in the rate base. The rents collected are used to reduce operating expenses. I know of no rule in law or in logic that would require a gas company to occupy the whole of a building when but a portion of it is necessary to its use, especially when the company will in the near future require the whole property for its own business. Both parcels are included in valuation subsequent to the date of their acquisition.

No evidentiary basis has been offered for the reduction of Mr. Rae's valuation. That stands uncontradicted as the value of plaintiff's land on June 1, 1923, and is allowed in the sum of $430,500.

### The Value of Mains and Services.

The valuation of the plaintiff's distribution system takes up a considerable part of the record. Four witnesses were examined and cross-examined at length upon this issue; two for the plaintiff and two for the defendants. The plaintiff called Henry J. Dillon, its superintendent, under whose personal supervision approximately 80 per cent. of the mains and services were laid, and John H. Duncan, a contractor who had performed a considerable amount of such work in the plaintiff's territory and in territory near by. The defendant Public Service Commission called its gas engineer, William

Merrifield, and the defendant Attorney General produced Archibald S. B. Little, an expert retained by him in gas rate cases.

All four witnesses valued the mains and services at widely variant figures. The witness Dillon presented an inventory which formed the basis of the testimony and valuations of himself and the other witnesses. There is no question of the extent of the distribution system. From the inventory it appears that the plaintiff has 792,239 feet of trunk lines and mains and 19,861 services in operation. The mains are partly of cast iron and partly of wrought iron, although by far the greater part is of cast iron.

Duncan appraised the mains at $2,387,273.17, and the services at $717,295.15—a total of $3,104,568.32. Dillon: Mains, $2,100,760.54; services, $625,919.76—a total of $2,726,680.30. Merrifield: Mains, $1,783,567.76. Little submitted two appraisals, the first being $1,503,368 for the mains and $375,000 for the services, a total of $1,878,368; and the second mains, $1,580,000, services, $494,000—a total of $2,074,000.

Of the two witnesses called by the plaintiff, Duncan seems to have had the more active general and varied experience in the laying of mains and services. I feel that both witnesses were ably qualified, but, generally, would incline to the view that the proper basis of valuation would be that from the contractor's point of view, as expressed by a contractor, rather than that from the same point of view, but not expressed by a contractor. Dillon is not, and has not been, a contractor. But he knows this distribution system; he, as he says, "has lived with it." However, the plaintiff in its brief states that it relies upon the valuation of Dillon rather than that of Duncan.

All of the various estimates were based upon reproduction figures. Mr. Little in his estimate did not take into consideration, or confine his consideration to, the costs of labor and materials for the year 1923, but averaged them over a 10-year period. Such an estimate is not reflective of 1923 values and cannot, therefore, be of any great aid in the ascertainment of values for the year in which the statute under attack became effective.

In his estimate of the cost to reproduce the mains, spread in full upon the record, Mr. Merrifield bases his figures upon reports made by the plaintiff to the Public Service Commission for the year 1923. From Dillon's inventory it appeared that the plaintiff had in 1923 a total of 792,239 lineal feet of trunk lines and mains.

According to Merrifield, who based his figure upon the plaintiff's reports to the Public Service Commission, the plaintiff "submitted a summary of gas main installation during that year aggregating 90,671 feet", but the evidence showed that the charges to the mains account during the year 1923 did not take in all of the costs applicable to the mains laid in that year. Upon the work thus done by the plaintiff in 1923 Merrifield bases his entire estimate of the value of the entire distribution system. He did not consider the system as a whole, except as an extension or a multiplication of the values found by him of the work done in a single year.

Dillon and Duncan, testifying for the company, valued the system upon a contract basis. Not so Merrifield. He says that his estimate is not based upon a contractual or subcontractual basis; that he made no allowance for contractor's or subcontractor's profits; that he assumed that the work would be done by the company under the supervision of Mr. Dillon and his present assistants. But Dillon, the man whom Merrifield says would do the work, figures the cost thereof at a much higher figure than does Merrifield.

In that branch of this case that deals with going value the defendants are insistent that there should be no consideration to co-ordinating and tuning up the plant, maintaining that that would be at the expense of the contractor. If, as they seem to assume under that branch of the case, the contractual basis is the proper one, why is it not equally so with the mains? There is a very sound basis for the valuation upon the contractual basis. Col. Miller testified that this was the best method, "because it is usually cheaper to construct by a general contractor, and some organization must be built up anyhow, in order to construct and co-ordinate the work. In order to secure the lowest unit cost, it needs some one of experience, and a general contractor can do it as a rule cheaper than a company organization, and a company organization anyhow would cost as much as a general contractor. It would be the cheapest way to reproduce this property. Either the general contractor or else the company would have to build up a large organization to do it, which organization would take some time to be co-ordinated, and would not be in the position under those conditions to get the best prices, during the period when the organization itself was being co-ordinated."

Merrifield's estimate is further weakened by the fact that he makes no allowance whatever for contingencies. Such an item might very well run into considerable volume in the accomplishment of a task like the entire reproduction of a distribution system of a gas company, a work which, says the witness, "has never been accomplished," and one in the preparation for which, and in estimating the cost of which, he says an engineer "is obliged to set aside his sense of values." These and other considerations affect the probative force of Mr. Merrifield's estimate.

There are testimony and exhibits upon behalf of the plaintiff to the effect that there should be added to Mr. Merrifield's estimate certain items omitted, as plaintiff maintains, from his appraisal, which, if added to the Merrifield appraisal, would bring it to a higher figure than that of Dillon. These are cost of cast iron pipe, omitted from Merrifield's estimate of 4-inch pipe mains, $165,-864.21; plaintiff says that Merrifield's pipe cost was based on 1922 figures, instead of 1923 costs, an omission that requires the addition of $78,576.19 and that $191,917.79 should be added, because he did not take actual paving conditions into consideration.

If these additions were made to Merrifield's appraisal, it would bring that estimate up to $2,219,925, or over $119,000 more than Dillon's appraisal. However, because of the other factors above outlined, I do not feel that it is necessary to attempt the reconciliation of the Merrifield and Dillon estimates, if, indeed, that were possible.

There is one other factor that affects the Merrifield exhibit. He did not take the system as it was. He suggested, and I have no doubt that the suggestion may be sound, that cast iron might be used in place of wrought iron. The company's experience may very well, as he says, corroborate this suggestion. However, the wrought iron is there, and this system is in part (not a large part, it is true) a wrought iron system, and I believe that in fixing its value we should take it as it is.

The defendant Attorney General finds some fault with the estimate of Dillon, for the reason that the witness based his estimate for labor upon prices that were in some instances somewhat higher than those which the plaintiff was in fact paying on the 1st day of June, 1923. But the money wages paid by the plaintiff upon that date did not measure the full compensation paid by the company and received by its employees. The latter were paid while they were ill; they were insured, and received other benefits. Then Dillon's approach to the task was not

from the viewpoint of the company, but from that of a contractor, for which reason he assumed the current labor prices paid by contractors, which he made a conscientious effort to ascertain from contractors employing similar labor in the vicinity of plaintiff's territory. Plaintiff's employees were in a steady employment. This aided plaintiff to receive and hold labor at somewhat under the rates usually paid by contractors, who could offer but irregular work.

I do not think that the fact that Dillon contemplated a wider trench for the laying of mains than Duncan estimated upon is particularly important. Probably no two men would agree as to which was the best and most economical method. The defendants argue that, if Dillon had adopted the trench width of Duncan, the value, as estimated by Dillon, would be much lower. Although Duncan contemplated the narrower trench, he figures a higher cost than did Dillon for the wider trench. I do not believe that the court should be asked to accept one man's trench width, because it is the narrowest, and the other man's estimated cost to dig it, because his figures are lower. There must be some consistency. On the whole, Duncan's figure is much higher than Dillon's. Defendants show no inclination to accept Duncan's valuation of the whole distribution system, and I am not particularly impressed with the urging of this particular item, because it happens to be lower. Such a method logically carried out—for the defendants, extracting all the items from all four valuations at the lowest appraisal, and, for the plaintiff, reversing the process and selecting all the items at their highest—would terminate in results altogether unjust, unsatisfactory, and not the slightest in accord with the testimony of any witness.

Included in the Dillon estimates are estimates of paving over the mains and the services. As to the mains: City inspection, $22,182.66; paving $29,982.79—a total of $52,165.45. As to the services: City inspection, $7,944.40, paving $26,727.58—a total of $34,671.98. The testimony of Dillon that he included only the pavement which had theretofore been disturbed by the plaintiff and that he applied the costs thereof as of June 1, 1923, as procured from the bureau of highways of the borough of Brooklyn, is uncontroverted.

Against the allowance of these items defendants cite People ex rel. Kings County Lighting Co. v. Willcox, 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1, and Des Moines v. Des Moines, 238 U. S. 153, 171, 35 S. Ct. 811, 59 L. Ed. 1244. In the former case, the court allowed the cost of the pavement actually in place when the mains were laid, and it appeared in the latter case that the streets were unpaved when the mains were laid. In the instant case the plaintiff does not claim for streets unpaved when the mains were laid, or streets paved subsequently thereto. Its proof was limited to streets where pavement had been actually removed when the mains were laid, the costs as of the proper date, June 1, 1923, were applied, and the cost of removing and replacing pavement, while it may add no efficiency to the functioning of the mains themselves, or add to their intrinsic value, is certainly an inescapable item of expense in their laying.

The Attorney General presents an elaborate tabulation, based, as he says, upon the company's authorizations for new main installations for the year 1923, which show values to be somewhat lower than those estimated by Dillon. The tabulations are open to the objection that they are the testimony of no witness who was called to the stand to testify to them and submit to cross-examination concerning them.

A service is a pipe which extends from the main in the street to the premises of the consumer. That the plaintiff had, on June 1, 1923, 19,861 services in operation is not controverted. The actual length of each of the nearly 20,000 services has not been proved in this case. Such proof, which would necessarily be very voluminous, is unnecessary, for the defendants did not establish that the average used was not an accurate one. Further, plaintiff says in its reply brief, and the evidence shows, and I do not find it controverted, that the average used was that fixed by the Public Service Commission. I am satisfied that on the 1st day of June, 1923, the plaintiff had in operation 792,239 feet of mains and 19,861 services, and that the mains were of a value of $2,100,761, and the services of the value of $625,920, exclusive of undistributed structural costs or overheads, to which I shall presently refer.

### Overheads.

It is elemental industrial economics that the cost of land, material, and labor does not represent the full amount that it is necessary to use in production or construction. That overheads are necessary, unavoidable, and must be allowed in this type of cases is recognized. Ohio Utilities Company v. Public Utilities Commission of Ohio, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656; New

York & Richmond Gas Co. v. Prendergast (D. C.) 10 F.(2d) 167. Upon this branch of the case, the plaintiff called Alten S. Miller, vice president of the Bartlett-Hayward Company, of Baltimore, contracting builders of gas plants, and upon his testimony claims in this case as overheads the following:

| | |
|---|---:|
| Omissions and contingencies | $ 50,362 00 |
| Organization and development prior to construction | 325,000 00 |
| Cost of financing | 340,000 00 |
| Engineering and superintendence and general contractor's expense and profit | 439,731 00 |
| Interest during construction | 217,153 00 |
| Taxes during construction | 4,918 00 |
| Administrative, legal, and miscellaneous expenses during construction | 95,557 00 |
| | $1,472,721 00 |

The formula upon which the witness arrives at these amounts and its application to the reproduction costs in suit is fully worked out in his working paper. These figures are arrived at substantially as follows:

Omissions and contingencies, 5 per cent. of the equipment at gas plants, including gas holders, $1,007,238.49, equaling $50,361.92.

Organization and development prior to construction, 5 per cent. of all reproduction costs and expenses, including working capital, but excluding going value and cost of financing, amounting to the sum of $6,542,871.13, equaling $327,143.55, which the plaintiff approximates at $325,000.

Cost of financing, same base used as in preceding paragraph, adding the cost of organization and interest thereon, bringing the base up to the sum of $6,540,556.09, and dividing that sum by 19 per cent., results in the sum of $344,239.79, which the witness and the plaintiff approximate at $344,000 as the cost of financing.

Engineering and superintendence and general contractor's expense and profit, 13 per cent. of the reproduction cost of equipment at gas plant, omissions and contingencies, buildings and appurtenances, and mains, totaling $3,382,547.18, equals $439,731.13.

Interest during construction "at the rate of 8 per cent. for the obtaining of the requisite new capital by a gas company in this territory"; 8 per cent. for six months on total value of equipment, apparatus, buildings, and appurtenances, including engineering and contractor's profits and expense and administrative expense, all in the sum of $3,917,835.27, equals $156,713.41, plus interest for one year at the rate of 8 per cent. per annum on the value of the land, $430,000, equals $34,440, plus interest for one year at the rate of 8 per cent. on organization and development expense, $325,000, equals $26,000, making the total interest expense, $217,153.

Administrative, legal, and miscellaneous expense during construction is figured at $2\frac{1}{2}$ per cent. of the value of equipment at plant, omissions, and contingencies, buildings and appurtenances, mains and engineering, general contractor's expense and profit, all of which amount to $3,822,278.31, equaling $95,556.95.

Upon behalf of the defendants, Mr. Little testified and presented a tabulation of overhead expenses, as he saw them, which is set out at length in a defendant's exhibit and therein recapitulated as follows:

| | |
|---|---:|
| Organization and administration | $ 92,500 00 |
| Legal expense | 35,000 00 |
| Engineering | 290,375 00 |
| Contingencies and omissions | 73,000 00 |
| Insurance | 55,000 00 |
| Taxes | 4,918 00 |
| Interest | 120,000 00 |
| | $670,793 00 |

In his tabulation, Mr. Little does not appear to have reached his conclusions by a percentage formula. He, however, itemizes his various elements thus:

#### Organization and Administration.

Financial—Per annum:

| | | |
|---|---:|---:|
| Chief executive (part of time) | | $ 5,000 00 |
| Assistant to executive | | 4,000 00 |
| Office staff | | 3,500 00 |
| Office expenses, transportation, printing, and advertising | | 2,500 00 |
| Total annual expense | | $ 15,000 00 |
| Total expense 2½ years | | $ 37,500 00 |

General—Per annum:

| | | |
|---|---:|---:|
| Assistant to chief executive | | $ 5,500 00 |
| Stenographers' services | | 2,400 00 |
| Clerks in general office | | 3,600 00 |
| Accounting division, for estimating and recording capital expenditures | | 6,000 00 |
| Supplies and expenses | | 5,000 00 |
| Total per annum | | $ 22,000 00 |
| Total expense 2½ years | | $ 55,000 00 |
| Total of organization and administration | | $ 92,500 00 |

Legal expense:

| | | |
|---|---:|---:|
| Expense prior to construction | | $ 15,000 00 |
| Expense during construction:— Annual expense | $10,000 00 | |
| Total expense 2 years | | 20,000 00 |
| Total legal expense | | $ 35,000 00 |

Engineering:

| | | |
|---|---:|---:|
| Consulting engineer, retainer | | $ 25,000 00 |
| Expense during construction:— Annual expense | $50,000 00 | |
| Total expense 2 years | | 100,000 00 |
| Total expense for consulting engineering | | $125,000 00 |

| | | |
|---|---|---|
| Brought forward ........................ | | $125,000 00 |
| Resident engineers: | | |
| District engineer................ | $10,000 00 | |
| Superintendent ................. | 8,000 00 | |
| Two assistants.................. | 10,000 00 | |
| Two inspectors.................. | 10,000 00 | |
| Two clerks...................... | 6,000 00 | |
| Purchasing department....... | 6,000 00 | |
| Rents and telephone........... | 5,000 00 | |
| Laboratory ..................... | 5,000 00 | |
| Transportation ................. | 7,500 00 | |
| General expense............... | 6,000 00 | |
| Annual expense.............. | $73,500 00 | |
| Total expense 2¼ years............... | | 165,375 00 |
| Total engineering expense.............. | | $290,375 00 |
| Contingencies: | | |
| Buildings ..................................... | | $ 7,000 00 |
| Plant and equipment....................... | | 20,300 00 |
| Street mains................................. | | 23,700 00 |
| Services ..................................... | | 11,000 00 |
| Meters ....................................... | | 11,000 00 |
| General equipment, tools, and appliances (as per books—no allowance).......... | | |
| Total contingencies........................ | | $73,000 00 |
| Insurance: | | |
| Included in a round sum of.............. | | $ 55,000 00 |
| Taxes: | | |
| Coincides, without passing upon amount, sum estimated by Col. Miller........... | | $ 4,918 00 |
| Interest: | | |
| Interest during construction.............. | | $120,000 00 |

Although he testified that there would be an actual outlay and expense for the cost of financing, Little did not include any allowance therefor in his estimate. Miller's testimony may therefore be taken to be undisputed upon this point. He estimated, as stated above, $340,000. If this item is added to Little's estimate at Miller's figure, Little having supplied none, it would bring Little's overhead estimate up to $1,010,793.

Upon his recross-examination, Little testified that in estimating overheads he used 18 per cent. of the value of all the physical property as of June 1, 1923, except land, using Miller's figures for the plant and equipment, Burt's figures for the buildings, and his own for the mains and services. I incline to the method adopted by Col. Miller, rather than that of Mr. Little, as the more accurate and consistent way of approximating what the overhead would amount to. Little's method freezes itself into a definite number of men, and it might work out very well if the organizer of the work was able to get at first, and keep throughout the entire progress of the work, men fully qualified for their tasks, sticking to them, and performing them exactly as planned. But human nature is too variable an element to react to such mathematical precision. It does not seem to me that Little has made full allowance for the turnover of men, just as inescapable in executive as in minor positions.

Miller sets the amount allotted to the task; Little, the number of men. Neither can, of course, be absolutely accurate, but I think Miller's finanical budgetary scheme would more closely approximate the ultimate financial cost of necessary overhead than Little's human schedule. I therefore allow the overheads in the amounts presented by and testified to by Col. Miller, as tabulated above in the second paragraph under this subject-matter headed "overheads" and totaling the sum of $1,472,721. Cf. New York & Richmond Gas Co. v. Prendergast (D. C.) 10 F. (2d) 167.

### Working Capital.

Of the necessity of adequate working capital in the management of any enterprise there can be no argument. It is the daily life blood stream of the business; it keeps the pay of those laboring for the company and the bills of its creditors and supply houses paid promptly. Not only must a mobile capital fund for those purposes be there, but it must be present from day to day in amounts adequate for the reasonable needs of the company. The adequate amount necessary even defendants' witness Mr. Little concedes is largely a matter of management.

Col. Miller arrives at his estimate of the amount necessary by allowing therefor 50 cents on each thousand cubic feet of gas sold during the year—in 1923, 1,080,363,400, which equals $540,181.70. Miss Dillon, the vice president of the plaintiff, presented two exhibits for the year 1923, the first showing the average monthly working capital for all corporate purposes for that year to be $698,897.33, and the amount of such capital necessary in its gas business to be $476,537.72. Mr. Little, for the defendants, estimated the amount necessary to be $396,316. This is approximately $400,000.

In view of Mr. Little's frank admission that the amount of working capital reasonably required is a matter of managerial judgment, and his testimony that the plaintiff company is well managed, and as the defendant's whole case is lacking of any proof whatever of mismanagement, I see no reason for discrediting the plaintiff's actual average experience for the year 1923. I do feel, however, that the basis of Miss Dillon's figure of $476,537.72 does not wholly support Col. Miller's estimate of $540,000. On the other hand, I do not think that any company should be held down to the ultimate penny of its proved necessary working capital, but that there should be a reasonable margin of safety thereover. In view of all the proofs

in this case, the sum of $500,000 for good years and bad years within the period here under review would be a reasonable allowance for working capital.

## Going Value.

The plaintiff asserts a claimed going value of $1,015,256. That is the estimate of that value submitted by its witness, Mr. George E. Woods, who has had an extensive experience as to the going elements of gas companies and other public utilities. Col. Miller, also called by the plaintiff, testified that it had a going value which he placed at $950,000.

While the defendants assert that there should be no allowance for going value, Mr. Little, one of the witnesses called by them, stated that in his opinion the plaintiff had going value in a sum closely approximating $575,000. He estimated that value as of May 1, 1925. Manifestly, the value of plaintiff's property is not to be confined to its physical property alone. It is a going business; it functions; it is not just so much idle realty, buildings, plant, apparatus, equipment, tools, and a distribution system. These are but the "bare bones," as Judge Lurton has called them in Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084.

The "expenditure of time, labor and money," says Miller, J., in People ex rel. Kings County Lighting Co. v. Willcox, 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1, "co-ordinates those bones into an efficient working organism and acquires a paying business." "The proper and reasonable cost of doing that," continues Judge Miller in the same case, "whether included in operating expenses or not, is as much a part of the investment of the company as the cost of its physical property."

That intangible property acquired by the "expenditure of time, labor, and money," which puts the whole works into motion, makes it function efficiently, makes the service available and useful to the public and a profitable enterprise to the company, is a real value, capable of measurement in rate cases, is now well recognized. In Monroe Gaslight & Fuel Company v. Michigan Public Utilities Commission (D. C.) 11 F.(2d) 319, the special statutory court (Denison, Circuit Judge, and Tuttle and Simons, District Judges) in its per curiam opinion says as to "going value":

"There remains the subject of the cost of converting the basic structure into a going business. There is much confusion as to the name by which this should be called. For the purpose of this opinion we will call it 'going value.' For this going value, the utility claims an additional sum of $65,000; while the commission, according to its computation, allowed a little less than $6,000.

"The plaintiff's expert evidence that there is a 'going concern' value of $65,000 is based in inseparable part upon the 'intangibles,' like favorable contracts, strategic situation, and community good will. These lead into debatable ground, where we have as yet no clear teaching from the Supreme Court, and we leave these things out of present consideration; but, so far as the conclusion of value depends on development costs, by which we mean the cost of getting customers, the case is different. * * * The early part is closely akin to interest during construction, and it would be prudent to have initial capital sufficient to use some of it for this development purpose.

"Whenever and to the extent that historical cost or prudent investment is to be determined, it is material to know whether this development cost has been repaid out of later profits; not so when we use the reproduction value as the starting point. It is too plain for doubt that the fair present value of a plant with an established output of 80,000,-000 feet is greater than that of an equivalent plant with no business. The additional value is there.

"Nor is it important that, if perhaps the business has been developed to the point of 'saturation' by an existing company, the hypothetical new plant would probably get the old customers with little expense. We are ultimately fixing the value of the old plant, not of the new one; we take the latter only as evidence, as far as it goes, of the former. If we suppose (arbitrarily) that an annual consumption of 30,000,000 was necessary to put this plant into the successfully established class and (again arbitrarily) that it cost $500 per million to get this business, we have an added $15,000 value plainly present in the plant, for which initial capital might wisely have been used, in order that dividends might not be delayed or diminished.

"Whether the utility actually made this back in current profits, or lost money every year, would be of no importance. In that franchise contract period annual losses were of course no criterion of development costs. The loss may have come because there was too little development expense, or too much, or there may be no relation between them.

Annual profits belong to the utility, to be withdrawn or to remain invested. The same principles apply with little, if any, less force to the cost of attaching the next 50,000,000, which might be (again arbitrarily estimated) $250 per million. We consider such costs as a clear incident of value pertinent to the replacement cost theory of fixing the rate base. Without that, the replacement is not complete."

As with the ascertainment of all other values in such cases, the courts have refused to prescribe or to follow any definite formula for measuring the property element known as going value. Each case is to be decided upon its own facts. A sound foundation for the testimony of plaintiff's opinion witnesses is found in the testimony of Miss Dillon, vice president of the company, which showed the existence of the elements of going value.

The tabulation presented by Mr. George E. Woods presents the best basis in this case for the consideration of going value. It is spread in full upon the record. Inasmuch as it does not lend itself to an abridgment consistent with clarity, it is here set out in full. It follows:

"1. Statement of Going Value of the Brooklyn Borough Gas Company as of June 1, 1923.

"July 1, 1925.

"To place the Brooklyn Borough Gas Company on the basis of a going concern (as of June 1, 1923), engaged in furnishing gas to its consumers, and having developed the operation and business of the company beyond the construction of the gas plant and the installation of the distribution system, and the setting of meters devoted to the use of consumers existing as of June 1, 1923, which are covered by the inventories and appraisals of Col. Alten S. Miller et al., in evidence in the pending case of the Brooklyn Borough Gas Company v. Prendergast et al., it would be necessary for the company to do certain work and incur certain additional costs which are included in what is known as the going value of a gas company. The additional costs considered by me may be classified as follows: First, the expense of obtaining the appliance business and the cost of their installation; second, the additional expense incurred in the operation of a new plant and system with a new personnel; third, the additional expense as a result of selling a lesser quantity of gas per dollar of

investment, until the appliances were all set and in operation.

"Col. Miller assumed the construction of the plants, mains, etc., in a period of one year. For the purpose of ascertaining the going value, I have assumed an expenditure of 60 per cent. of Col. Miller's figure (including working capital) as having been expended when operations started and the remaining 40 per cent. during the first year of operation.

"2. Time Required to Reproduce the Existing Business as of June 1, 1923.

"It will require two years after the commencement of operations to secure the business of the Brooklyn Borough Gas Company to the extent that such business was secured as of June 1, 1923. It is assumed that the new company will commence to set meters and install gas-consuming appliances one year from the time the construction of the plant was started, and during the second year of operation the company will complete all installations, so as to produce the physical property in existence June 1, 1923.

"Some preliminary work, such as canvassing, advertising, demonstrating, etc., will have to be done prior to that time; therefore it is estimated that, during the first year of actual operation, 60 per cent. of all the meters and gas-consuming appliances in use as of June 1, 1923, will have been installed, and the remaining 40 per cent. will be completed during the second year of active operation. I am assuming the quantity of gas to be consumed on the basis of sales for the year 1923, and the number of active meters as of June 1, 1923, and that the prospective consumers are educated in its use.

Gas sales for the year—1923....... 1,080,363,400 cu. ft.
Number of active meters—June 1,
 1923 ............................. 25,456
Sales per active meter............. 42,400 cu. ft.

"3. Operations of the Company.

"As previously stated, it would take the new company at least two years after commencement of operation to develop its sales to the point where the gas sales had actually been developed as of the year 1923. In order to attain, at the end of that period, the sales of the Brooklyn Borough Gas Company as of the year 1923, I have therefore made a study and estimate of the prospective sale of gas by a new company during the first three years of its existence as follows:

| | Cu. Ft. | Cu. Ft. |
|---|---|---|
| During the first year the new company will set 15,274 meters, representing for a full year's operation an average of 7,637 meters, consuming 42,440 cu. ft. of gas per meter | | 324,114,280 |
| During the second year 15,274 meters set the first year consuming 42,440 cu. ft. per meter | 648,228,560 | |
| 10,182 meters set during second year representing for a full year's operation an average of 5,091 meters, consuming 42,440 cu. ft. per meter | 216,062,040 | 864,290,600 |
| During the third year, 25,456 meters set the previous two years, consuming 42,440 cu. ft. | | 1,080,552,640 |
| Total sales of new company for the three years of | | 2,268,957,520 |
| As compared with 1,080,363,400 cu. ft. per annum, or a total of | | 3,241,090,200 |
| sold by the old company | | |

I have assumed that the price of gas per M cubic feet to be charged by the new company is the same as that being charged by the old company.

## "4. Items of Cost in Attaching the Business.

"*Appliance Expense.*—The advertising, commissions, promotions, and other expenditures applicable thereto of the Brooklyn Borough Gas Company, for the year 1923, shows that the cost to sell and deliver an appliance during that year amounted to $8.48, and that the average cost of connecting an appliance amounted $4.70. An examination of the company's books and records shows that the number of appliances on the district is at least two appliances for each meter on the district, so that, if the year 1923 were used as a basis for determining the cost of putting these appliances into service, it would amount to $26.36 per active meter. For the purpose of this calculation I am using a round figure of $26.00 per active meter:

| | |
|---|---|
| 1st year—60% of 25,456 meters—15,274 meters at $26 | $397,124 |
| 2d year—40% of 25,456 meters—10,182 meters at $26 | 264,732 |
| 25,456 | $661,856 |

"*New Plant and Personnel.*—The operating expenses for the year 1925 was 94.42 cents per M with a well ironed out plant and personnel. Inasmuch as the new company would have no revenue from the sale of appliances, etc., this would increase the operating costs, which would be partly offset by such items as canvassing, advertising, etc., which would be included in determining the "going value," and not put into operating expense.

"I am therefore of the opinion that the actual cost of gas during the first year of operations of the new plant, after taking all things into consideration would be not less than $1 per M cubic feet, and not less than 96 cents during the second year of operations. The increase in the operating cost for the first two years, upon this basis would be as follows:

| | |
|---|---|
| 1st year, 324,144,280 cu. ft. at 5.58 cts. per M | $18,085 |
| 2d year, 864,290,600 cu. ft. at 1.58 cts. per M | 13,656 |
| Total for two years | $31,741 |

"*Sales per Dollar of Investment.*—As the sale of gas per dollar of investment during the first two years of operation will be less with a new company, the investors in the new enterprise will have to forego the return upon this property to the extent of the difference between the return of the investment of the old company and the return upon the investment of the new company as a result of a lesser quantity of gas sold by the new company.

## "5. Investment in Old Company.

| | |
|---|---|
| Reproduction value as of June 1, 1925 | $6,340,556 00 |
| Working capital as of June 1, 1923 | 540,000 00 |
| | $6,880,556 00 |

## "New Company—Capital Expenditures.

"During a one-year period of construction it is estimated that 60 per cent. of the total expenditures (including working capital) will have been made, and the new company will begin its operation and delivery of gas to its consumers at the expiration of such period. During the first year of actual operation, the new company will expend the remaining 40 per cent., so that at the end of the first year of operation the total expenditure will have been made. The investment would therefore be:

| | |
|---|---|
| At the commencement of operation (60 per cent. of 6,880,556) | $4,128,334 00 |
| Expended during first year of operation (40 per cent. of 6,880,556) | 2,752,222 00 |
| This amount of money expended during this time will equal the reproduction value of the Brooklyn Borough Gas Company, as of June 1, 1923, exclusive of going value | 6,880,556 00 |

## "6. New Company—Operations—First Year.

| | |
|---|---|
| Investment at commencement of operations after a one-year period of construction (see page 5) | $ 4,128,334 |
| Sales during first year, cu. ft. | 324,114,280 |
| Additional cost of obtaining the appliance business and the installation of appliances (see page 4) | 397,124 |
| Additional cost due to lesser quantity of gas sold per dollar of investment (see below) | |
| Additional cost as result of new plant and personnel | 18,085 |
| 8 per cent. return on value of property—old company per M. C. F. on annual sales | $ .5095 |

8 per cent. return on value of property invested first year. New company—per M. C. F. on annual sales...................... 1.0190

Increase due to lesser sales per dollar of investment per M. C. F. on annual sale, $.5095; 324,114,280 cu. ft. at $.5095 per M. C. F. equals............................ 165,136
Additional cost during first year of operation .................................. 580,345

"Additional cost due to a lesser quantity of gas sold per dollar of investment calculated as follows:

Investment—old company................. $6,880,556 00
Return at 8 per cent...................... 550,444 48
Gas sold—old company.............. 1,080,363,400 C. F.
Amount necessary to obtain the 8 per cent. return per M. C. F. of annual sales ($550,444.48 divided by 1,080,363,400 cu. ft.)... $ .5095 per M. C. F.
Investment in new company—first year (shown above)............................ $4,128,344 00
Return 8 per cent.......................... 330,266 72
Gas sold—first year new company (shown above)...................... 324,114,280 C. F.
Amount necessary to obtain the 8 per cent. return per M. C. F. of annual sales ($330,266.72 divided by 324,114,280 cu. ft.)............. 1.0190 per M. C. F.

"We therefore find that due to a lesser sales per dollar of investment the carrying charge per M. C. F. of annual sales during the first year of operation of the new company is $1.0190, as compared with 50.95 cents with the old company, an increase of 50.95 cents per M. C. F. on 324,114,280 cu. ft., or $165,136.

"7. New Company—Operations—Second Year.

Investment at commencement of operations (see page 5)................................. $4,128,334
Expended during first year of operations (see page 5)................................. 2,752,222

Investment in plant and property at beginning of second year of operation...... 6,880,556
Additional cost during first year of operation (see page 6).......................... 580,345

Total investment, commencement second year ....................................... $7,460,901
Sales during second year (see page 6) 864,290,600 cu. ft.
Additional cost of obtaining the appliance business and the installation of appliances (see page 4)......................... $ 264,732
Additional cost as result of new plant and personnel (see page 4).................... 13,656
Additional cost due to lesser quantity of gas sold per dollar of investment (see below)
8 per cent. return on value of property—old company per M. C. F. on annual sales........................ $.5095
8 per cent. return on value of property invested second year—new company, per M. C. F. on annual sales ................................. .6906
Increase due to lesser sales per dollar of the investment per M. C. F. on annual sales..................... .1811
864,290,600 cu. ft. at 18.11 cents. per M. C. F. 156,523
Additional cost during second year of operation .................................. 434,911

"Additional cost, due to lesser quantity of gas sold per dollar of investment, calculated as follows:

Investment—old company................. $6,880,556 00
Return at 8 per cent...................... 550,444 48
Gas sold—old company..............1,080,363,400 cu. ft.
Amount necessary to obtain the 8 per cent. return per M. C. F. of annual sales ($550,444.48 divided by 1,080,363,400 cu. ft.)....................$.5095 per M. C. F.
Investment in new company—second year $7,460,901 00
Return at 8 per cent...................... 596,872 08
Gas sold—second year, new company..864,290,600 C. F.
Amount necessary to obtain the 8 per cent. return per M. C. F. of annual sales ($596,872.08 divided by 864,290,600 cu. ft)........................$.6906 per M. C. F.

"We therefore find that, due to a lesser sales per dollar of investment, the carrying charge per M. C. F. of annual sales during the second year of operation of the new company is 69.06 cents as compared with 50.95 cents with the old company, an increase of 18.11 cents per M. C. F. on 864,290,600 cu. ft., or $156,523.

"8. New Company—Operations—Third Year.

Investment at commencement of second year (see page 7)........................ $7,460,901 00
Additional costs during second year of operations (see page 7).................. 434,911 00

Total investment—commencement of third year............................... $7,895,812 00
Investment in old company as of June 1, 1923 ........................................ 6,880,556 00

Going value of old company as of June 1, 1923 ........................................ $1,015,256 00

"I am therefore of the opinion that the Going Value of the Brooklyn Borough Gas Company in its gas business as of June 1, 1923, and the present time is at least $1,015,256."

Mr. Wood's exhibit, which assumes that it would take at least two years for a new company to get to the going concern position, which was that of the plaintiff on June 1, 1923, may be summarized thus:

Expense of obtaining appliance business and cost of installation:
  First year................... $397,124 00
  Second year............... 264,732 00   $ 661,856 00

Additional expense incurred in the operation of a new plant and personnel:
  First year................... $ 18,085 00
  Second year............... 13,656 00   31,741 00

Additional expense as a result of selling a lesser quantity of gas per dollar of investment until all appliances are set and in operation:
  First year................... $165,136 00
  Second year............... 156,523 00   321,659 00

                  $1,015,256 00

Going value is not to be confused with good will. Users of the service and commodity of a utility having a monopoly in its territory are dependent upon that particu-

lar utility for that service and commodity irrespective of their good or ill will toward the utility. Nor is franchise value to be considered as a part of going value, and it had not been considered in this case.

I am not unmindful that the appliance business may not be subject to regulatory control. Use of gas, however, without appliances is impossible. The development of such business is necessarily important to a gas company in its gas sales. The cost of obtaining such business is a necessary incident to the conduct of the plaintiff's business. It is a cost that has its reflection in the going value of the plaintiff.

Of course, a gas company does not have a monopoly of the sale of appliances in its territory, as it has of the sale of gas. They may be purchased elsewhere, in or out of the territory. Possibly not all of the appliances would be purchased of the company. There is no evidence before me of what proportion of such appliances were in fact purchased of the plaintiff and what proportion were purchased of others. It may not be of great importance, for the question is not the determination of the plaintiff's costs, but the worth of its going value. Certainly no company could await the initiative of its prospective customers, nor the efforts of others to sell appliances before doing business. It would have to rely upon its own efforts and not those of others. Until the district is equipped with appliances, there could be no gas business. The company would have to go after such business very energetically, and be prepared to stand the cost of obtaining it as rapidly as possible, getting its profit out of the sale of gas, which would necessarily await the equipping of the district with appliances to use it.

Irrespective of the extent to which the expense of the appliance business has been included in operating costs, I think that it has a distinct, important, and inescapable bearing upon going value. That is a value which each company has to establish for itself, if it is to be successful, and it seems to me that one of the most important factors in getting it established is getting the district fully equipped with appliances in the quickest possible time.

The cost of obtaining the valuable, but intangible, asset, which has come to be known as "going value," is not, in my opinion, to be confused with "pioneer losses," which the courts have held are not to be capitalized. I do not regard Woods' estimate of the amount of time, labor, and money necessary to develop the business as in any way the estimation of pioneer losses. It is a cost that must be met, if the business is to be successfully established. To hold such costs as losses, and deprive a utility of the advantages to be gained from such expenditures, would be manifestly unjust. Such costs have their reflection in going value. That there is no proof in the record that the plaintiff actually expended the amounts estimated by Woods, as an expert, is true. This is immaterial. The issue is present value, not what it cost to acquire it.

Woods' figures are, however, subject to some infirmities. They are based on $540,-000 working capital. I have allowed $500,-000. Further, Woods testified:

"Q. Did you eliminate rate case expenses— A. No; I did not.

"Q. (continuing). —which amounted to $20,858.55? A. No, I did not.

"Q. Do you assume that a company which just started operating, under the reproduction theory, would have that expense? A. No; and I think I could soundly have taken it out. I think it would have been the logical thing to do, to take it out.

"Q. Didn't you eliminate federal income tax, $34,076.06? A. I did not touch federal income tax. If it was included in the operating costs, I did not take it out.

"The Master: That should be taken out, should it not, Mr. Woods?

"The Witness: Yes; I think so, but I am not sufficiently familiar with the federal income tax law to say. However, it would seem to me to be reasonable.

"Mr Goetz: If your honor please, that depends upon the rate you are going to charge whether you are going to have an income tax.

"Q. You assumed the present rate, did you not? A. I assumed the present rate.

"Q. Under your theory, which includes the assumption that for the first year the plant is running at a loss, how would it have to pay a federal income tax? A. As I said, I did not take it out; but I think it should be taken out, if they had no earnings, and the probabilities are they would not have any."

I have given the most careful consideration to all the proof adduced in this case as to going value. As noted above, it was appraised by Woods at $1,015,256, by Miller at $950,000, and by Little at from $572,000 to $575,000. Upon the whole record, the plaintiff has, in my opinion, a going value of at least $800,000.

### Depreciation.

There was tendered in this case no proof of depreciation in the plaintiff's property.

The plaintiff offered proof of the amounts necessary to restore certain of its property to a condition as if new, and contends that there is no depreciation beyond these figures. It does not even concede that these amounts should be deducted, basing its argument on the fact, which is duly enforced by the evidence, that its plant is at present, and was on the 1st day of June, 1923, in good state of repair, operating efficiently and well, and just as serviceable, in every particular, as a similar plant entirely reproduced and brand new, and in which, because of its present reproduction, there could be no depreciation. Basis for this contention in law is found in New York & Queens Gas Co. v. Newton (D. C.) 269 F. 277, affirmed 258 U. S. 178, 42 S. Ct. 268, 66 L. Ed. 549, opinion of Special Master Gilbert; Consolidated Gas Co. v. Newton (D. C.) 267 F. 231, affirmed 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538, opinion of Learned Hand, District Judge; Bronx Gas & Electric Co. v. Public Service Commission, 28 N. Y. State Dept. Rep. 329; Id., 208 App. Div. 780, 203 N. Y. S. 922, report of Referee Williams; New York & Richmond Gas Co. v. Nixon, appeals dismissed 203 App. Div. 861, 196 N. Y. S. 941, 204 App. Div. 838, 197 N. Y. S. 933, report of Referee Sewell; as well as in other recent decisions by the federal courts in this circuit, involving the validity of the statute here under review.

However, the testimony upon which the plaintiff relies is that of witnesses who submitted appraisals, inventories and figures and exhibits based upon the value of plaintiff's property reproduced new. These witnesses further testified that although the property was functioning efficiently there would have to be done certain work to restore the property to a condition as if new.

The ultimate issue in these cases is not reproduction cost but value. Certainly, if plaintiff's witnesses estimate the cost of reproduction new, and also testify that the property is not in a condition as if new, and measure clearly in dollars and cents the difference in value between new property and plaintiff's property, that difference affects the real value just as does the estimate of reproduction cost itself. Plaintiff is, of course, bound by this proof it has produced.

Col. Miller testified that he had found the apparatus and equipment at the plant were well maintained and in a condition substantially as good as new, that they were operating efficiently, that they were well maintained, and that renewals had been made from time to time as necessary. He also presented a detailed statement of the work and

expenditures necessary to put the works in a condition as if new, showing such expenditures to total the sum of $24,236,41.

Mr. Burt testified that the expenditures of $5,424 would put plaintiff's buildings in a condition as if new, and presented a full and detailed statement of the work necessary to be done and the cost thereof, which was duly received in evidence. I have deducted both Miller's and Burt's estimate to restore new from their valuation of the property appraised by them.

Upon behalf of the defendant Attorney General, Mr. Little testified that he estimated that it would require approximately $200,000 to restore plaintiff's property to condition as if new. He submitted no facts or figures in support of his estimate. I do not find much probative force in it. All of the plaintiff's property, as well as its books and accounts, were open to the inspection and the examination of the defendants; but they produced no evidence of depreciation, and produced no evidentiary basis of any force to reduce plaintiff's claimed values except as aforesaid.

### Fair Value of Plaintiff's Property, Inclusive of Working Capital and Going Value.

The full present value of all of plaintiff's property, used and useful in its gas business, as of the 1st day of June, 1923, all of which have been considered in their various constituent factors above, is summarized as follows:

| | | |
|---|---:|---:|
| Land | | $ 430,500 00 |
| Buildings | $ 224,186 00 | |
| Less cost to restore to condition as if new | 5,424 00 | 218,762 00 |
| Gas manufacturing plant (other than land and buildings) | 1,007,238 00 | |
| Less cost to restore to condition as if new | 24,236 41 | 983,001 59 |
| Mains | | 2,100,761 00 |
| Services | | 625,920 00 |
| Meters | | 408,639 00 |
| General equipment | | 53,906 00 |
| Tools and implements | | 7,694 00 |
| Gas engines and appliances | | 8,991 00 |
| Working capital | | 500,000 00 |
| Going value | | 800,000 00 |
| Overheads— | | |
| Omissions and contingencies | $ 50,362 00 | |
| Organization and development prior to construction | 325,000 00 | |
| Cost of financing | 340,000 00 | |
| Engineering and superintendence and general contractor's expense and profit | 439,731 00 | |
| Interest during construction | 217,153 00 | |
| Taxes during construction | 4,918 00 | |
| Administrative, legal, and miscellaneous expenses during construction | 95,557 00 | 1,472,721 00 |
| Total | | $7,610,895 59 |

This total valuation substantially coincides with the opinion of the main witness produced by the defendants, Mr. Little. Upon cross-examination he admitted that he had advised a client that "a purchase price for this property may be conservatively fixed at $7,500,000; for rate-making purposes we believe that the court would sustain a valuation of over $8,000,000." There is no controversy upon the record as to the value either of the additions to plaintiff's property, nor withdrawals therefrom since June 1, 1923.

The proof showed that the value of the net additions to December 31, 1923, was $385,154.07; to December 31, 1924, $721,701.93; and to the end of the 12 months ending August 31, 1925, $435,774.65. The total value of all plaintiff's property used and useful in its gas business, as of the four dates mentioned, as proved before me follows:

| | |
|---|---|
| June 1, 1923............................... | $7,610,895 59 |
| Net additions to December 31, 1923....... | 385,154 07 |
| Total value as of December 31, 1923...... | $7,996,049 66 |
| Net additions to December 31, 1924........ | 721,701 93 |
| Total value as of December 31, 1924...... | $8,717,751 59 |
| Net additions to August 31, 1925.......... | 435,774 65 |
| Total value as of August 31, 1925......... | $9,153,526 24 |

#### Conclusion.

All the evidence clearly shows that the dollar rate, fixed by the statute, considered apart from the standard fixed thereby, is confiscatory. When the standard is also considered, it only adds to the margin by which the statute is confiscatory. The statute, if enforced, would leave the plaintiff no substantial return upon the value of its property. The case is so clear that no experimentation with either rate or standard was or is required to establish its unconstitutionality.

Whitman, Ottinger, Ransom, Coulson & Goetz, of New York City (William L. Ransom, Jacob H. Goetz, and Robert E. Coulson, all of New York City, of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Charles E. Murphy, of Brooklyn, N. Y., of counsel), for defendant Public Service Commission.

John Holley Clark, Jr., of New York City (Francis R. Stoddard, Sp. Deputy Atty. Gen., of counsel), for defendant Attorney General.

Before MANTON, Circuit Judge, and CAMPBELL and INCH, District Judges, holding Court pursuant to Section 266 of the Judicial Code (Comp. Statutes, § 1243).

MANTON, Circuit Judge. [1] The special master appointed in this suit has reported that the New York state statute (chapter 899 of the Laws of 1923) which prohibits the plaintiff, as a public utilities corporation engaged in furnishing gas to inhabitants of the borough of Brooklyn, city of New York, from making a charge in excess of $1 per thousand cubic feet and requiring gas furnished to have a standard of not less than 650 British thermal units, is unconstitutional as to this plaintiff because it is confiscatory. The District Courts for the Southern and Eastern Districts of New York have held the law to be unconstitutional: New York & Richmond Gas Company v. Prendergast (D. C.) 10 F.(2d) 167; Kings County Lighting Company v. Prendergast (D. C.) 7 F.(2d) 192; Brooklyn Union Gas Company v. Prendergast (D. C.) 7 F.(2d) 628; Consolidated Gas Company v. Prendergast (D. C.) 6 F.(2d) 243; New York & Queens Gas Company v. Prendergast (D. C.) 1 F.(2d) 351. This result has been affirmed by the Supreme Court of the United States in Ottinger v. Brooklyn Union Gas Company, 47 S. Ct. 199, 71 L. Ed. ——; Ottinger v. Kings County Lighting Company, 47 S. Ct. 199, 71 L. Ed. ——; and Ottinger v. Consolidated Gas Company, 47 S. Ct. 198, 71 L. Ed. —— (decided November 29, 1926).

[2] The valuations in the present case justify the same holding; they also allow an 8 per cent. return. The commission unanimously determined on May 10, 1922, that this plaintiff requires an 8 per cent. return to pay its bond interest, other fixed charges and dividends in order to carry on its business successfully and attract new capital. Such a rate is permissible under McCardle v. Indianapolis Water Company, 47 S. Ct. 144, 71 L. Ed. ——, decided by the Supreme Court in November, 1926.

[3-9] On the argument, so far as we were able to ascertain the position of the Attorney General and the commission, objection was made to the allowances for depreciation, going value, reproduction, and working capital. We have examined these various items and the method of arriving at the values as fixed by the master, and the views he expresses and the reasons advanced are satisfactory to us. We have likewise examined the exceptions filed by the plaintiff to these items of valuation for reproduction cost of tangible property, the allowance for working capital, and the going value possessed by the plaintiff in its business. We think the decision of the master as to these items is correct. He has been guided by, and followed, the rule announced in the authoritative decisions of the Supreme Court, which found utterance in

its latest pronouncement (Indianapolis Water Company Case, 47 S. Ct. 144, 71 L. Ed. ——, decided November, 1926).

The opinion and report of the special master deserves commendation for its careful consideration and analysis of the issues. We deem it unnecessary to add more than to say that his conclusions and reasons therefor meet with our approval.

Motion to confirm the report is granted.